**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 24-80055-CIV-CANNON**

**MAURICE MCWILLIAMS,**

Plaintiff,

v.

**RICHARD COMERFORD,[1] SECRETARY,**
**FLORIDA DEPARTMENT OF**
**CORRECTIONS,**

Defendant.
_______________________________________/

**POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**THIS CAUSE** comes before the Court following a two-day bench trial held in March 2026 [ECF Nos. 110–111]. Plaintiff Maurice McWilliams ("Plaintiff"), a Florida state prisoner currently detained at the Martin Work Camp in Martin County, Florida, seeks to grow a fist-length beard consistent with the requirements of his Muslim faith [ECF No. 1 pp. 5, 11]. However, the Florida Department of Corrections' grooming policy ("FDOC Grooming Policy"), *see* Fla. Admin. Code R. 33-602.101, requires that inmates be either clean shaven or maintain a one-half inch beard [ECF No. 1 pp. 4–5, 11]. Plaintiff therefore seeks an exemption to the FDOC Grooming Policy under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). *See* 42 U.S.C. § 2000cc *et seq*. Upon full review of the Complaint [ECF No. 1], the Answer and Affirmative Defenses [ECF No. 28], the substantial evidence and testimony presented over the course of the bench trial [ECF Nos. 116, 117, 120, 121], the parties' post-trial briefs [ECF Nos. 123, 124], and

---

[1] Richard Comerford is substituted as Defendant in this case following his appointment as the Secretary for the Florida Department of Corrections on July 1, 2026. *See* Fed. R. Civ. P. 25(d).

the full record, the Court issues the following factual findings and legal conclusions. First, the Court concludes that Plaintiff has satisfied his initial burden under RLUIPA: he has demonstrated both that he sincerely believes that he must grow at least a fist-length beard consistent with his Muslim faith and that the FDOC Grooming Policy substantially burdens his ability to do so. *See* 42 U.S.C. § 2000cc-1(a). However, the Court also concludes that the FDOC Grooming Policy, as applied to Plaintiff, furthers Defendant Florida Department of Corrections' ("Defendant") compelling interest in maintaining safe and secure prisons and is the least restrictive means in furtherance of that compelling interest. *See id*. Therefore, Plaintiff is not entitled to an exemption to the FDOC Grooming Policy.

**BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff initiated the instant lawsuit upon filing his *pro se* Civil Rights Complaint pursuant to 42 U.S.C. § 1983 [ECF No. 1], Motion for Leave to Proceed *in forma pauperis* ("IFP") [ECF No. 3], and Motion for Preliminary Injunction [ECF No. 4]. The Complaint names Ricky Dixon, then-Secretary of the Florida Department of Corrections (FDOC), as the sole defendant ("Defendant") [ECF No. 1 p. 1], and alleges that the FDOC Grooming Policy prevents Plaintiff from growing either a fist-length or free-flowing beard, as is required by his Muslim faith, in violation of the First Amendment and RLUIPA [ECF No. 1 pp. 4–5, 13].

After this Court granted Plaintiff's Motion for Leave to Proceed *in forma pauperis* [ECF No. 5], the Court screened the Complaint [ECF No. 7] and ordered that service be rendered [ECF No. 9]. The U.S. Marshals served Defendant with a copy of Plaintiff's Complaint and Motion for Preliminary Injunction [ECF No. 12], and Plaintiff later filed a Motion for Temporary Restraining Order [ECF No. 17]. The Court ultimately denied Plaintiff's Motions for a Temporary Restraining Order and Preliminary Injunction [ECF No. 20].

Following service, Defendant filed a Partial Motion to Dismiss Plaintiff's Complaint, arguing that Plaintiff failed to state a claim upon which relief could be granted under the First Amendment [ECF No. 19 pp. 3–5]. The Partial Motion to Dismiss did not address Plaintiff's RLUIPA claim [*see generally* ECF No. 19 pp. 1–5]. After receiving and reviewing Plaintiff's Response [ECF No. 22] and Defendant's Reply [ECF No. 23], the Court granted the Partial Motion to Dismiss and dismissed Plaintiff's First Amendment claim [ECF No. 24]. Defendant then filed its Answer and Affirmative Defenses to Plaintiff's remaining RLUIPA claim [ECF No. 28].

On November 26, 2024, the parties filed cross-Motions for Summary Judgment [ECF Nos. 47–48]. Defendant later filed an Amended Motion for Summary Judgment [ECF No. 54], which corrected a scrivener's error [ECF Nos. 51, 53]. In Plaintiff's *pro se* Motion for Summary Judgment, he argued that there existed no dispute about the "sincerity" of his belief "that growing a beard is a religious exercise," but noted that the Defendant "does dispute that its policy substantial burdens that exercise" [ECF No. 47 p. 2]. Defendant's Amended Motion for Summary Judgment argued that the undisputed facts demonstrated that (1) Plaintiff's belief that he must grow a fist-length beard is not sincerely held, and (2) the FDOC Grooming Policy is "the least restrictive means of furthering [Defendant's] compelling government interest[s]" in safety and security, "conserving its limited resources," and "health/hygiene" [ECF No. 54 pp. 5–16]. After the case was referred to the Volunteer Attorney Program [ECF No. 62], Attorney Pierce Joseph Schultz was added as counsel for Plaintiff [ECF No. 68]. Plaintiff, through Attorney Schultz, then withdrew his Motion for Summary Judgment and elected not to file another such motion [ECF No. 72]. After Defendant's Motion for Summary Judgment was fully briefed, the Court denied the motion, concluding that material factual disputes remained as to (1) the sincerity

of Plaintiff's religious beliefs and (2) whether the FDOC Grooming Policy "passes the least restrictive means test" [ECF No. 86 pp. 5–10].

Following adjudication of Defendant's Amended Motion for Summary Judgment, the Court entered an Amended Scheduling Order setting trial for the trial period beginning March 23, 2026 [ECF Nos. 91, 93–94]. Judicial notice was also taken of the Quran and certain widely recognized Hadith collections, namely Sahih al-Bukhari and Sahih Muslim, consistent with the parties' joint request [ECF Nos. 95, 101].[2]

Trial was held from March 23 to March 24, 2026 [ECF Nos. 110–111]. Following trial, the Court allowed the parties to submit discretionary post-trial briefing [ECF Nos. 111, 122]. Both parties did so on April 13, 2026 [ECF Nos. 123, 124].

## FACTUAL FINDINGS

The Court heard testimony from the following witnesses during the bench trial: (1) Maurice McWilliams ("Plaintiff"); (2) Martin Correctional Institution Correctional Officer Richard Bogle ("Correctional Officer Bogle"), who transported Plaintiff to trial and testified regarding Plaintiff's grooming condition; (3) Carl Wesley Kirkland, Jr. ("Kirkland"), Deputy Director of Institutional Operations for the FDOC; (4) Dr. Jonn Darbyshire ("Dr. Darbyshire"), administrator of the FDOC's Religious Diet Program; and (5) James Upchurch ("Upchurch"), an expert witness proffered by FDOC in the areas of prison security, correctional procedures, policies, standards and practices. Additionally, the Court admitted into evidence 84 exhibits consisting of, among other things, various excerpts from the Quran and certain widely recognized Hadith collections

[2] Calendar Call was held on March 17, 2026, during which the parties announced their readiness for trial and discussed objections to defense exhibits [ECF No. 107; *see* ECF No. 109 (final Amended Joint Exhibit List prior to trial)].

[ECF No. 112-1; ECF No. 116-63]; numerous religious contact logs [ECF Nos. 116-4–116-21]; Plaintiff's disciplinary history [ECF Nos. 116-47–116-52]; and photographs depicting easily concealable contraband items [ECF Nos. 116-54–116-56].

After considering all of the testimony, evidence, and arguments from the parties, the Court finds the following facts.

**I. The Parties and Witnesses**

1. Plaintiff is a 43-year-old man. He has been incarcerated since 2008 and is serving a 30-year sentence for robbery with a nondeadly weapon [ECF No. 116-23; ECF No. 120 pp. 33–35]. Plaintiff has been convicted multiple times of committing armed robberies using a BB-gun manipulated to look like a real firearm [ECF No. 116-23; ECF No. 120 pp. 33–34, 129–31]. In 2014, while incarcerated, Plaintiff converted to Islam [ECF No. 116-83 p. 8; ECF No. 120 p. 34].
2. Defendant is Richard Comerford, Secretary of the Florida Department of Corrections ("FDOC"). FDOC is the third largest state-run prison system in the United States, housing approximately 90,000 inmates in 49 major facilities [ECF No. 116-3; ECF No. 120 pp. 150–51, 169]. Some facilities also have one or more satellite units attached to them, such as work camps or a work release center [ECF No. 116-3; ECF No. 120 pp. 150–51]. Approximately 80,000 of the inmates housed in FDOC facilities are male [ECF No. 116-3; ECF No. 120 p. 156]. FDOC operates on a $3.4 billion budget [ECF No. 120 p. 151].
3. Richard Bogle ("Correctional Officer Bogle") is a correctional officer employed at Martin Correctional Institution who transported Plaintiff to court on Monday, March 23, 2026, for the bench trial in this matter [ECF No. 120 p. 139].

4. Carl Wesley Kirkland, Jr. ("Kirkland") currently serves as the Deputy Director of Institutional Operations with the FDOC [ECF No. 120 pp. 146–48]. He has been employed at various positions with the FDOC for over 35 years, beginning as a correctional officer in 1990 [ECF No. 120 pp. 148–49]. In his current role, Kirkland implements statewide policies affecting inmate management [ECF No. 120 pp. 149–50].

5. Dr. Jonn Darbyshire ("Dr. Darbyshire") currently serves as a "government operations consultant" and the FDOC "chaplaincy statewide religious diet program coordinator" [ECF No. 121 pp. 39–40]. In this role, Dr. Darbyshire monitors, audits, and trains employees at FDOC institutions on running the FDOC Religious Diet Program ("RDP") [ECF No. 121 p. 40].

6. James Upchurch ("Upchurch") is a consultant and retired corrections professional who has worked in correctional institutions throughout the United States since 1968 [ECF No. 121 pp. 88–90]. He began his career in Mississippi, where he served as the warden of a 1,500-bed medium custody prison [ECF No. 121 p. 89]. In 1982, he moved to Arizona, where he was the warden of various types of prisons for 14 years [ECF No. 121 p. 89]. In 1996, Upchurch accepted a position as the Security Bureau Chief with the FDOC, a position he held for over a decade [ECF No. 121 p. 89]. Upchurch was later promoted to the Director of Security Operations, Classification, and a few other bureaus [ECF No. 121 p. 89]. In 2013, he was again promoted to the Assistant Secretary responsible for all prisons and the re-entry program, where he remained until his retirement in 2015 [ECF No. 121 p. 89]. After his retirement, he has worked as a consultant [ECF No. 121 pp. 89–90]. In this role, he has traveled to 38 states consulting primarily on prison security matters [ECF No. 121 pp. 90–91]. He has also served as an expert witness on approximately 50 cases

[ECF No. 121 p. 90]. The Court found Upchurch qualified as an expert in the areas of "prison security as well as correctional procedures, policies, standards, and practices" [ECF No. 121 pp. 93–94]. The Court also concludes, following a full review of his testimony, that Upchurch's testimony satisfies the substantive requirements for expert testimony in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

## II. Plaintiff's Religious Adherence

7. Since Plaintiff converted to Islam in 2014, he has regularly abided by many aspects of his religion. Every week he attends Jumuah, or worship service, and Taaleem, where he studies the Quran [ECF No. 116-83 pp. 14, 172–75; ECF No. 120 pp. 36–38; *see also* ECF No. 116-61 pp. 29–31]. Every year, he fasts during the Month of Ramadan and celebrates both Eid Al-Fitr and Eid-Al Adha [ECF No. 120 p. 38; *see also* ECF No. 116-61 p. 28]. He prays five times a day [ECF No. 116-83 p. 14; ECF No. 120 p. 38; *see also* ECF No. 116-61 p. 29].

8. Plaintiff testified that he has served as an Imam twice while incarcerated [ECF No. 120 p. 39; *see also* ECF No. 116-83 p. 167–70]. He generally describes an Imam as a faith-based elected leadership position [ECF No. 120 p. 39; *see also* ECF No. 116-61 p. 30]. Plaintiff testified that, in this position, he gave sermons at Jumuah and taught Taaleem [ECF No. 120 p. 39; *see also* ECF No. 116-83 pp. 167–68]. However, Defendant credibly argued that it would be impossible to serve as an Iman while in prison because inmates cannot serve in "leadership positions" or otherwise have "authority over another inmate" [ECF No. 121 p. 69, 108–19; *see also* ECF No. 116-26 ("No inmate shall be given control or authority over other inmates")]. Therefore, the Court does not find Plaintiff's specific

claim that he has served as an Imam to be credible. However, the Court lends credibility to Plaintiff's more general claim that he has attended religious gatherings while incarcerated.

9. As part of his faith, Plaintiff is required to "obey Allah and his messenger" [ECF No. 120 pp. 38–39, 44; ECF No. 116-83 pp. 12–16; *see also* ECF No. 116-61 p. 30]. Plaintiff does so by reading the Quran and Hadith and following the teachings contained therein [ECF No. 120 pp. 41–44; ECF No. 116-83 pp. 14–16].

10. The "five pillars of Islam" include: (1) "[t]he testimony of faith;" (2) "[p]raying five times a day;" (3) "[f]asting during the month of Ramadan;" (4) "[p]aying the zakat," or giving yearly to charity; and (5) "making the Hajj," or pilgrimage [ECF No. 120 p. 40; ECF No. 116-83 pp. 12–14; *see also* ECF No. 116-61 pp. 30–31].

11. As a Muslim man, Plaintiff believes that "he should have at least a fist-length beard and trim his mustache" [ECF No. 120 p. 41; ECF No. 116-83 pp. 15–16]. Plaintiff believes that the requirement that he grow a fist-length beard derives from the teachings in the Hadith [ECF No. 120 pp. 43–44, 82; ECF No. 116-83 pp. 15–16; ECF No. 112-1].

12. Additionally, Plaintiff testified that he complies with the purification and Fitrah requirements of his religion, part of which requires that he "lower" his pubic hair and underarm hair at least once every forty days [ECF No. 120 pp. 101, 106, 142; *see generally* ECF No. 116-83 pp. 24–25]. However, during a strip search prior to arriving to Court, Correctional Officer Bogle observed hair growth on Plaintiff's body that he described as not "new growth hair" [ECF No. 120 pp. 140–41]. Weighing the evidence, given that Plaintiff need only "lower" his body hair every forty days, the Court finds Plaintiff's

testimony that he complies with the purification and Fitrah requirements of his religion credible on this issue.

13. In order to comply with the purification and Fitrah requirements, Plaintiff credibly testified that he had previously used an electric trimmer, which he had possessed since his incarceration at South Bay Correctional Institution [ECF No. 120 pp. 143–45]. However, since his trimmer is now broken, Plaintiff maintains compliance by borrowing trimmers owned by other inmates [ECF No. 120 pp. 100–104, 145–46]. Plaintiff declined to pluck his hairs to comply with his purification and Fitrah requirements [ECF No. 120 pp. 101–03].

14. Electric trimmers are contraband in FDOC prisons, and Plaintiff's possession of such trimmers would be considered possession of contraband [ECF No. 121 pp. 27–29; *see also* ECF No. 116-29].

15. In 2021, Plaintiff was placed in the same institution as another inmate, Durrell Sims ("Inmate Sims"), during which time he would see Inmate Sims at weekly worship services [ECF No. 120 pp. 60, 70; *see also* ECF No. 116-32; ECF No. 116-83 pp. 53–56]. In 2023, they were placed in the same dorm together, where they saw each other daily [ECF No. 120 pp. 69–70]. Inmate Sims informed Plaintiff, as well as other Muslim inmates, that it was possible to obtain an exemption to the FDOC Grooming Policy by formally grieving the policy and filing a civil rights lawsuit [ECF No. 120 pp. 74–76, 94; ECF No. 116-83 pp. 54–55]. Plaintiff testified that, upon learning this from Inmate Sims, he "immediately" filed grievances with the FDOC and then commenced the instant action [ECF No. 120 pp. 55, 94].

16. As part of his faith, Plaintiff abides by the "greater harm principle," which he describes as follows: "if there is a greater harm concerning either [a follower] being obedient to Islam, then it will be okay in that situation . . . to go against Islam, as long as, within your heart, you still have belief of faith" [ECF No. 120 pp. 45–46; *see also* ECF No. 116-83 pp. 42–47]. However, Plaintiff testified that a believer is obligated to try to abide by his religious requirement when he learns that there is a way to safely do so [ECF No. 120 pp. 75–76].

17. Plaintiff believes that his adherence to the FDOC Grooming Policy is an example of the "greater harm principle" [ECF No. 120 pp. 47–48; ECF No. 116-83 p. 43]. Consistent with that principle, once he learned that he could obtain an exemption to the grooming rule, he was compelled to file the instant lawsuit [ECF No. 120 pp. 55–56, 94–96]. The Court finds credible Plaintiff's testimony regarding the "greater harm principle" and its application to the circumstances of the instant lawsuit.

18. The FDOC Religious Diet Program ("RDP") meets the requirements of the Jewish Kosher diet, which is stricter than the Muslim Halal diet [ECF No. 121 pp. 83–84; *see also* ECF No. 116-62; ECF No. 116-61 pp. 29, 35 (indicating that both Jewish and Muslim inmates are permitted to request any of the religious dietary options in the RDP)]. There are approximately 7,000 Muslim inmates in FDOC prisons [ECF No. 120 pp. 185–86]. However, there are only about 3,400 inmates on the RDP, of which only a subset is Muslim [ECF No. 121 p. 73].

19. Plaintiff has repeatedly failed to abide by the RDP [ECF No. 116-4; ECF No. 116-6; ECF No. 116-10; ECF No. 116-13; ECF No. 116-15; *see also* ECF No. 120 pp. 114–125; ECF No. 121 pp. 50–63]. Plaintiff was on the RDP beginning in November 2014 but violated the RDP when he attempted to purchase unapproved items from the commissary

[ECF Nos. 116-5–116-6; *see also* ECF No. 120 pp. 119; ECF No. 121 pp. 51–55;]. He was re-approved for the RDP two days after the violation but voluntarily withdrew about two weeks later [ECF No. 116-8–116-10; ECF No. 120 pp. 121–22; ECF No. 121 pp. 55–58]. Plaintiff was then re-approved for the RDP in December 2017 [ECF No. 116-12; ECF No. 121 p. 59]. However, he once again violated the RDP by attempting to purchase, possess, or consume a non-RDP approved item from the canteen [ECF No. 116-13; ECF No. 121 p. 59]. After failing to appear for a face-to-face meeting to address the violation, he was suspended from the RDP program for 30 days [ECF No. 116-15; ECF No. 121 p. 60–61]. He then withdrew from the RDP in July 2018 [ECF No. 116-16; ECF No. 121 p. 61]. Plaintiff's later attempts to be placed back on the RDP, once in 2019 and again in 2023, were each denied because he failed to articulate a religious reason for placement on the RDP [ECF No. 116-18; ECF No. 116-20; ECF No. 121 pp. 62–63].

20. As part of determining whether one has a "religious reason" for placement on the RDP, FDOC chaplains measure subjective sincerity by examining objective facts, like an inmate's religion of record, disciplinary history, attendance of services, and prior adherence to the RDP [ECF No. 121 pp. 44–45; *see generally* ECF No. 116-62]. Testifying to this fact, Dr. Darbyshire clarified that, when measuring sincerity in the RDP context, it is not the goal to "determin[e] what's in [an inmate's] heart" [ECF No. 121 pp. 75–76].

21. Despite Plaintiff's documented history of non-adherence to the RDP [*see* ECF Nos. ECF No. 116-4–116-15], the Court finds that his repeated withdrawal from the RDP, while indicative of his less-than-consistent religious practices, is insufficient to negate his otherwise credible claims regarding the sincerity of his religious beliefs

[*see, e.g.*, ECF No. 120 pp. 36–49, 56–57, 87, 114, 117; *cf.* ECF No. 116-62 (including as part of the RDP application a question regarding whether an inmate's religious dietary needs could be "met by self-selecting from the regular food line with alternative entrees or the vegan meal plan")].

22. Since Plaintiff's conversion to Islam, he has received six disciplinary reports: four for possessing a cell phone, one for possessing K2 (or synthetic marijuana), and one for disobeying a verbal order [ECF Nos. 116-47–116-52; ECF No. 120 pp. 49, 85–87]. Plaintiff admits that his June 30, 2020, disciplinary report for possessing K2 bears on his belief in Islam [ECF No. 116-52; ECF No. 120 pp. 50, 86]. K2 is a leafy substance that an individual would ingest through inhalation [ECF No. 120 pp. 128, 220; *see also* ECF No. 116-52]. It is an illegal Schedule I drug [ECF No. 121 pp. 34–35; *see also* 18 C.F.R. § 1308.11; ECF No. 120 p. 132 (Plaintiff acknowledging that K2 is an "illicit drug outside of prison")]. Unlike natural marijuana, it can be different colors: Plaintiff testified that it looks like potpourri [ECF No. 120 pp. 128–29; *but see* ECF No. 116-52 (describing the K2 found on Plaintiff's person as a "green leafy substance")]. It is also dangerous: Kirkland credibly testified that, based on his experience in FDOC prisons, K2 can cause inmates to suffer from significant brain injuries, delusions, and even death [ECF No. 120 pp. 217–20 (Kirkland testifying that K2 is an "extremely dangerous" stimulant synthetic drug made by mixing "all kinds of various chemicals" whose makeup changes over time, including to disguise its properties from drug screens)].

23. Plaintiff concedes that, given his history of possessing contraband, Defendant would harbor security concerns if Plaintiff were permitted to grow a fist-length beard [*see* ECF No. 120 pp. 127–28].

## III. The FDOC and its Grooming Policy

24. About 60 percent of FDOC's inmate population is incarcerated for a violent crime [ECF No. 120 p. 152]. Additionally, approximately 60 percent of that violent population maintain a "higher custody level," corresponding to approximately 36 percent of FDOC's inmate population [ECF No. 120 p. 152]. "During the last fiscal year, FDOC handled approximately 3,000 inmate-on-inmate assaults, 1,600 inmate-on-staff assaults, and 17 or 18 inmate homicides [ECF No. 120 pp. 153–54].

25. The FDOC houses approximately 7,000 Muslim inmates and 6,500 Jewish inmates, which account for approximately fifteen percent of the total inmate population [ECF No. 120 pp. 185–86].

26. The FDOC implements policies and procedures to maintain order and security within its prisons [*see* ECF No. 116-26–116-28; ECF No. 120 pp. 154–56]. These policies also establish "consistency across the state" [ECF No. 120 p. 167–68]. They are promulgated in-part from learning from "the deficiencies" of other state systems and ensuring that FDOC policies and procedures are written to minimize such deficiencies [ECF No. 121 p. 22].

27. Prior to 2015, the FDOC required that inmates remain clean shaven unless they had a medical exemption, at which point they were permitted to grow a quarter-inch beard [ECF No. 121 pp. 176; ECF No. 121 pp. 25–26; *see also* Fla. Admin. Code r. 33-602.101 (2014)]. However, following the United States Supreme Court decision in *Holt v. Hobbs*, 574 U.S. 352 (2015), the FDOC revised its grooming policy to allow inmates to grow a half-inch beard [ECF No. 116-1–116-2; ECF No. 116-26; *see also* ECF No. 120 p. 161]. Under the current FDOC Grooming Policy, inmates cannot shape their facial hair, and their

mustache and beard must be the same length [ECF No. 116-26 pp. 8–9 (reproducing Fla. Admin. Code Ann. r. 33-602.101 – Care of Inmates); ECF No. 120 p. 161].[3] Inmates are also prohibited from growing the hair on their head beyond a "[s]hort to medium, uniform length" [ECF No. 116-26 pp. 8–9; ECF No. 120 pp. 176–77]. This generally corresponds to a length no greater than three inches of hair [*see* ECF No. 120 pp. 211–13]. The FDOC searches inmates' head hair by having inmates bend over at the waist and allowing them to

[3] The full text of the grooming policy, codified in Florida's Administrative Code in a chapter dedicated to security operations, states as follows:

> (4) For security and identification purposes, no inmate shall be permitted to have his or her hair, to include eyebrows and facial hair, dyed, cut, shaved or styled according to fads or extremes that would call attention to the inmate or separate inmates into groups based upon style. This would include, for example, dreadlocks, tails, woven braids, cutting, sculpting, clipping or etching numbers, letters, words, symbols or other designs into the hair. Male inmates shall have their hair cut short to medium uniform length at all times with no part of the ear or collar covered. Male inmates shall be permitted to shave their entire heads with clippers in a uniform manner unless the inmate is using his hairstyle or lack thereof to demonstrate gang affiliation or otherwise pose a threat to institutional security. Partial shaving of the head in a Mohawk or other distinctive style shall not be permitted. Sideburns shall not extend beyond the bottom of the earlobes and will have straight lines with no flare at the base. Female inmates shall be prohibited from having their hair braided or styled in any area other than the institutional beauty shop. All inmates shall elect either to be clean shaven or to grow and maintain a half-inch beard. Such a beard shall include all the hair that grows naturally on the face and front of the neck, excluding eyebrows and eyelashes. Inmates shall not display any other type, style, or arrangement of hair on the face nor front of the neck. Inmates shall not sculpt nor edge their beards. No numbers, symbols, letters, nor other designs shall appear in inmate beards. Those male inmates who desire to remain clean shaven shall be clipper shaved three times per week, and those inmates who desire to grow a half-inch beard shall have their beards trimmed three times per week with a clipper fitted with a half-inch guard. Female inmates may possess one (1) disposable state-issued razor. Notwithstanding any other provision of chapter 33, F.A.C., upon intake at any Department reception center each inmate having hair on the face or the front of the neck shall be clean shaved once for the purpose of discovering any identifying marks, scars, tattoos, or other features.

Fla. Admin. Code Ann. R. 33-602.101(4).

search the top of their head [ECF No. 120 pp. 58; 62; *see generally* ECF No. 116-28 (indicating that visual searches "may be routinely conducted on clothed inmates . . . at random")].

28. The current FDOC Grooming Policy allows for easy identification of inmates both while in prison and in the event of an escape, ensures that contraband cannot be hidden, and allows for visual searches of both head and facial hair [ECF No. 120 pp. 58, 62, 161–62, 183–84, 194–95].

29. Inmate photographs are taken at least every five years or if the inmate's appearance changes [ECF No. 120 pp. 174–75].

30. Kirkland credibly testified that, if all Muslim inmates elected to grow a beard, FDOC would expend approximately $200,000 in staff time in issuing new Identification Cards, about $2.9 million for hair picks, about $4.8 million for rubber cloves, and about $888,000 in staff time to search the beards, totaling approximately $8.8 million [ECF No. 120 pp. 187–190].

**IV. Plaintiff's Adherence to the FDOC Grooming Policy**

31. As part of his Islamic faith, Plaintiff believes that he must let his beard grow to at least a fist-length [ECF No. 120 pp. 41]. However, Plaintiff has trimmed his facial hair numerous times in accordance with the FDOC Grooming Policy and has no documented grooming rule violations [ECF No. 120 p. 54; ECF No. 116-83 pp. 15–16].

32. Plaintiff testified based on his own experiences as a prisoner in FDOC facilities that a prisoner who fails to abide by the FDOC Grooming Policy could be reported for the violation, placed into solitary confinement, or forcibly shaved by Correctional Officers [ECF No. 120 pp. 47–48, 54–56]. Defendant failed to credibly rebut this testimony.

Therefore, the Court finds Plaintiff's testimony regarding potential punishments for failing to abide by the FDOC Grooming Policy credible.

33. Plaintiff arrived to Court with a beard that he admitted exceeded the FDOC's one-half inch grooming requirement [ECF No. 120 pp. 59]. Plaintiff's facial hair on that day measured a little over one inch in length, which Plaintiff knew was a violation of the grooming policy.

34. Kirkland testified based on his experience that Plaintiff's beard, at its current one-inch length, could conceal small items of contraband [ECF No. 120 p. 183]. The Court finds this testimony credible and reliable.

35. Despite converting to Islam in 2008, Plaintiff did not file a grievance challenging the FDOC Grooming Policy until 2023 [ECF No. 120 pp. 93–94; ECF No. 116-66]. Plaintiff testified that he waited to challenge the FDOC Grooming Policy because he was not aware that he could do so using the "outside courts" until another inmate (Sims) told him about it [ECF No. 120 pp. 55, 93–94; *see also* ECF No. 116-83 pp. 53–59]. The Court finds Plaintiff's testimony to this effect credible to the extent it bears upon Plaintiff's sincerity of religious belief.

**V. Reasons for the FDOC Grooming Policy**

36. On a yearly basis, the FDOC finds thousands of contraband items in its prisons, including illegal drugs, ammunition, handcuff keys, homemade blades, and escape paraphernalia [ECF No. 121 pp. 18–19, 111–12].

37. As Kirkland and Upchurch credibly and reliably testified, contraband can be hidden in a beard that is longer than one half an inch [ECF No. 120 pp. 126–27, 178; ECF No. 121 pp. 111–12]. Such concealable contraband includes, but is not limited to: razor blades, handcuff keys, small quantities of drugs, or SIM Cards [ECF No. 120 pp. 126–27, 178;

ECF No. 121 pp. 111–12; *see also* ECF No. 116-54–116-56]. Further, Plaintiff's current beard, at approximately one inch in length (which exceeds the "half-inch" beard threshold in the grooming policy), could conceal small items of contraband [ECF No. 120 p. 183]. Plaintiff himself concedes that a thick beard of greater than one-half inch in length could be used to hide contraband, including a razor, handcuff key, small quantities of drugs, or a SIM card [ECF No. 120 pp. 125–156, 133], although he also testified that a beard is not a good place to hide contraband because it could "fall out" or "easily be seen" [*see* ECF No. 120 pp. 64, 133–34]. To the extent a factual dispute exists on the contraband risk created by exceeding the half-inch rule and allowing a fist-length beard as requested, the Court finds based on a full review of the evidentiary record that allowing a fist-length beard for Plaintiff would present a material risk of hiding contraband, would require photos to be updated periodically, would correspond to an increase in cost for the FDOC, and would hinder identification efforts [ECF No. 120 pp. 195–96; ECF No. 121 pp. 97–98, 111–12; *see also* ECF No. 116-59].

38. There have been no incidents in which the two inmates in the FDOC system who have been granted exemptions to the FDOC Grooming Policy—Inmate Sims and inmate Abdul Hakeen Jahmal Naseer Shabazz (also known as Owen D. Denson) ("Inmate Shabazz")—have hidden contraband in their beards [ECF No. 121 p. 6]. However, as Mr. Kirkland credibly testified, even model inmates pose risks to correctional officers [ECF No. 120 pp. 205–06], and Plaintiff has not been a model inmate [ECF No. 116-47 (disciplinary history)].

39. Kirkland credibly testified that the risk of an inmate escaping a "secure perimeter"—i.e., a prison—is low, but escapes from non-secure facilities such as community work release

centers or work camps are more frequent and pose a greater risk [ECF No. 121 pp. 6–8; *see also* ECF No. 116-3 (indicating the number of FDOC inmates in secure and non-secure facilities)]. Kirkland also credibly indicated that Plaintiff could be eligible for placement in a work camp prior to the end of his sentence, though he noted that Plaintiff would not "be eligible to go outside and work on an outside work squad" [ECF No. 121 pp. 8–9].

40. The FDOC Grooming Policy prevents escapes and allows for quick recapture [ECF No. 121 pp. 129–30; *see also* ECF No. 116-26 (indicating that the FDOC Grooming Policy is enforced "[f]or security and identification purposes")]. In the event of a prisoner escaping, time is of the essence, and quick and easy means of identifying that inmate are important to ensuring that they are swiftly apprehended [ECF No. 120 pp. 226–27; ECF No. 121 pp. 109–11]. Upchurch and Kirkland credibly testified, and the Court finds, that the use of more than one photograph depicting what the inmate could "potentially" look like would hinder law enforcement's ability to locate and apprehend an escaped inmate under the volatile and time-intense circumstances of a prison escape [ECF No. 120 pp. 227–29; ECF No. 121 pp. 109–11; *see also* ECF No. 116-59; ECF No. 116-53].

41. The FDOC Grooming Policy furthers the compelling interest of ensuring that Plaintiff cannot quickly alter his appearance, either while in prison or upon escape [ECF No. 120 pp. 161–62, 184–85, 194–95; ECF No. 116-59; ECF No. 116-26]. The Court reaches this finding notwithstanding that Plaintiff has no specific history of escapes (or attempted escapes from prison) and that Plaintiff has not voluntarily shaved his beard since the updated grooming policy went into effect [ECF No. 120 pp. 54, 214]; *see also* ECF No. 116-83 p. 59]. Plaintiff has a history of engaging in deceptive and noncompliant conduct, both in connection with his prior convictions (robberies using disguised weapons)

and through his prison disciplinary history reflecting five separate instances of possessing contraband in prison [ECF No. 120 pp. 129–31; ECF No. 116-47 to ECF No. 116-52]. Plaintiff also testified during a deposition in this case that he "follows the rule," referring to compliance with the grooming policy [ECF No. 116-83 p. 59], but Plaintiff obviously violated the grooming policy in real and knowing terms when he came to court in violation of the grooming policy. *See supra* Finding of Fact 33.

42. Like the military, FDOC inmates must abide by rules and regulations to ensure that they remain uniform in their appearance [ECF No. 121 pp. 106–08; *see generally* ECF No. 116-26]. This uniformity allows for a small group of correctional officers to effectively supervise a much larger group of prisoners and minimizes the chance of disrupting the inmate population [ECF No. 120 pp. 166–68; ECF No. 121 p. 108; *see also* ECF No. 116-26]. The FDOC Grooming Policy ensures uniformity by maximizing hair length—on both the head and the face—and prevents inmates from sculpting their hair [ECF No. 120 p. 173; ECF No. 116-26]. If an inmate was given an exemption to the current FDOC Policy, there would not be uniformity as to that particular inmate [ECF No. 120 p. 209].

43. Kirkland testified that correctional officers sometimes fail to enforce rules and regulations due to staff complacency, a lack of training or knowledge, or simple staff disregard [ECF No. 120 pp. 210–211]. While Kirkland could not recall any more specific incidents of staff failing to enforce policies that affect safety and security, the Court nonetheless finds credible his testimony that the FDOC expects correctional officers to strictly enforce all FDOC rules and regulations, but that officers and other employees sometimes fail to do so [ECF No. 120 pp. 208–11]. That sporadic reality does not undermine the legitimate security and identification concerns underlying FDOC's Grooming Policy.

**VI. Evidence Regarding Plaintiff's Requested Exemption From the Grooming Policy**

44. Under the current policy, correctional officers visually search inmates' beards [ECF No. 120 pp. 183–84; *see generally* ECF No. 116-26]. But when an inmate has longer or thicker hair, an officer may require that an inmate run his own hands through his hair [ECF No. 121 pp. 15, 138–39]. Upchurch credibly and reliably testified that a fist-length beard could not be visually searched [ECF No. 121 p. 103]. Instead, a fist-length beard would have to be physically searched by either Plaintiff himself (a "self-search") or a correctional officer his/her hands, a pick, or a comb [ECF No. 120 p. 184].

45. Kirkland and Upchurch credibly testified that allowing inmates to self-search presents an intolerable risk of non-compliance, as inmates could manipulate the beard so that contraband could not be seen [ECF No. 120 pp. 207; ECF No. 121 pp. 106, 122–23, 134]. The Court finds this testimony, as provided by both witnesses, to be credible.

46. Kirkland and Upchurch also credibly testified that a manual search by correctional officers would be burdensome for both correctional officers and inmates [ECF No. 120 pp. 204–05; ECF No. 121 pp. 106, 148–49]. Upchurch specifically testified, based on his experience working in prisons where longer beards are permitted, that both correctional officers and inmates find searches of an inmate's beard to be "distasteful" and "intrusive" and either disfavor, or completely forego, undertaking them [ECF No. 121 pp. 105–08]. Correctional officers would be required to search either from behind the inmate—which could lead to an officer poking an inmate in the eye or mouth—or in front of the inmate—which exposes the officer to attack [ECF No. 120 pp. 204–05; ECF No. 121 pp. 122–24, 138]. Plaintiff's specific history of possessing contraband while incarcerated increases this risk [ECF Nos. 116-47–116-52]. While a cell phone is too bulky to be hidden in a fist-

length beard [ECF No. 121 pp. 13–14], small drugs, blades, cell phone SIM cards, and other contraband could be hidden in a fist-length beard if it is woven into it or stuck using a paste [ECF No. 121 pp. 116–20, 142–43; *see also* ECF No. 116-52; ECF No. 116-54–116–56].

47. Allowing for a single exemption to the grooming policy by itself creates additional risks of contraband being brought into prison [ECF No. 120 pp. 170–71].

48. Plaintiff has no sustained disciplinary history involving violent acts arising from his current term of incarceration [ECF No. 120 p. 215; ECF No. 116-47]. The record shows that Plaintiff was written up in 2023 for battery or attempted battery on another inmate [ECF No. 121 p. 25]. The Inspector General interviewed Plaintiff and the other inmates involved in the altercation and ultimately dismissed the Disciplinary Report for "administrative errors" [ECF No. 121 pp. 156, 158].

**LEGAL STANDARDS**

Section 3 of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, prohibits the government from "impos[ing] a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person" is both "in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that" interest. 42 U.S.C. § 2000cc-1(a)(1)–(2).[4] A plaintiff bringing a claim under RLUIPA first bears the burden of

---

[4] The full text of this substantive prohibition reads as follows:

> (a) General rule
>
> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the

demonstrating that a government policy—in this case, the FDOC Grooming Policy—substantially burdens the exercise of his sincerely held religious beliefs. *See Holt*, 574 U.S. at 360–61; *see also* 42 U.S.C. § 2000cc-1(a). If the plaintiff satisfies his burden, the defendant must show that the policy both furthers a compelling governmental interest *and* is the least restrictive means of furthering that interest. *Holt*, 574 U.S. at 362; *see also* 42 U.S.C. § 2000cc-1(a)(1)–(2).

In RLUIPA, Congress broadly defines the term "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7). Congress also stated that RLUIPA "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on [a prisoner's] religious exercise." 42 U.S.C. § 2000cc-3(c). In this light, the Supreme Court has held that courts should construe the statute "in favor of a broad protection of religious exercise, to the maximum extent permitted . . . ." *Holt*, 574 U.S. at 358 (quoting 42 U.S.C. § 2000cc-3(g)). At the same time, the Court has recognized that RLUIPA "affords prison officials ample ability to maintain security,"

---

government demonstrates that imposition of the burden on that person—

> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

(b) Scope of application

This section applies in any case in which—

> (1) the substantial burden is imposed in a program or activity that receives Federal financial assistance; or
> (2) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes.

42 U.S.C. § 2000cc-1.

*id.* at 369, and does not "elevate accommodation of religious observances over an institution's need to maintain order and safety," *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005).

**DISCUSSION**

**A. Plaintiff's Burden**

*i. Whether the Plaintiff's Religious Belief is "Sincerely Held"*

First, the Court must determine whether Plaintiff's religious beliefs are "sincerely held." "Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion," it "does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *See Cutter*, 544 U.S. at 725 n.13 (citations omitted). "Sincerity is generally presumed or easily established," and is therefore "not often challenged." *Moussazadeh v. Texas Dep't of Criminal Justice*, 703 F.3d 781, 791 (5th Cir. 2012). But where the sincerity of a prisoner's religious belief is challenged—as is the case here—courts must take a holistic approach to determine whether a plaintiff's beliefs are truly "sincere." *See, e.g.*, *Ackerman v. Washington*, 16 F.4th 170, 181 (6th Cir. 2021) ("[C]ourts can consider factors like length of adherence, knowledge about the belief system, and the existence of religious literature and teachings supporting the belief" (citing *Fox v. Washington*, 949 F.3d 270, 277–78 (6th Cir. 2020))).

Courts have found that a "'properly developed record' on the sincerity issue 'includ[es] testimony from the inmates' and 'reference to religious texts.'" *Fox v. Washington*, 949 F.3d 270, 277 (6th Cir. 2020) (quoting *Haight v. Thompson*, 763 F.3d 554, 565–66 (6th Cir. 2014)). In the context of Christianity, the record in *Fox* noted that the plaintiffs "spoke in great detail, and, at times, passionately, about their beliefs at trial," "discussed the Bible," "testified that they follow the teachings of certain leaders of Christian Identity," and maintained the lawsuit for over seven years. *Id.* at 277–78. Additionally, the Fifth Circuit looks "to the words and actions of the inmate"

to determine whether the beliefs he espouses are "important to him." *Moussazadeh*, 703 F.3d at 791. And the Supreme Court has recognized that "[t]he 'exercise of religion' often involves not only belief and profession but the performance of . . . physical acts [such as] assembling with others for a worship service [or] participating in sacramental use of bread and wine . . . ." *Cutter*, 544 U.S. at 720 (quoting *Employment Div. v. Smith*, 494 U.S. 872, 877 (1990)).

That said, courts "should not undertake to dissect religious beliefs because the believer admits that he is 'struggling' with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Thomas v. Rev. Bd. Of Indiana Employment Sec. Division*, 450 U.S. 707, 715 (1981); *see also Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 584 U.S. 617, 651 (2018) (noting that courts have "no license to declare . . . whether an adherent has 'correctly perceived' the commands of his religion") (Gorsuch and Alito, JJ., concurring). Indeed, district court rulings that impermissibly focused on whether a belief is "central" to a party's religion routinely have routinely been to be erroneous. *See, e.g.*, *Shakur v. Schriro*, 514 F.3d 878, 885 (9th Cir. 2008) ("Here, the district court impermissibly focused on whether 'consuming Halal meat is required of Muslims as a central tenet of Islam,' rather than on whether [the plaintiff] sincerely believe[d] eating kosher meat is consistent with his faith"); *Williams v. Wilkinson*, 645 F. App'x 692, 698 (10th Cir. 2016) ("The district court erred by inserting a 'religious requirement' element into RLUIPA" when it incorrectly required that the plaintiff assert that he "requires a kosher diet to practice his sincerely-held beliefs").

Consistent with these principles, the Eleventh Circuit has narrowly defined the court's role in the sincerity inquiry, limiting a reviewing court to determining "whether the line drawn between conduct that is and is not permitted under one's religion reflects an honest conviction." *Davila v.*

*Gladden*, 777 F.3d 1198, 1204 (11th Cir. 2015) (alterations omitted). A court must therefore look "only to see whether 'the claimant is (in essence) seeking to perpetrate a fraud on the court—whether he actually holds the beliefs he claims to hold.'" *Id.* (quoting *Yellowbear v. Lampert*, 741 F.3d 48, 51 (10th Cir. 2014))

Defendant challenges the sincerity of Plaintiff's belief that he must grow, at a minimum, a fist-length beard [ECF No. 121 pp. 177]. In doing so, Defendant raises reasonable questions as to the sincerity of Plaintiff's religious belief: particularly as it relates to Plaintiff's failure to adhere to the RDP [ECF No. 120 pp. 114–25; ECF No. 121 pp. 50–63], his history of disciplinary violations and admission to the possession of contraband [ECF No. 120 pp. 49–50, 85–87, 100–104, 145–46; ECF No. 121 pp. 27–29; ECF No. 116-47], and his alleged failure to maintain the characteristics of Fitrah [ECF No. 120 pp. 140–41]. However, viewing the record as a whole, Plaintiff has met his low burden. Plaintiff testified credibly that he attends weekly Jumuah worship service and Taaleem studies, fasts during Ramadan, and celebrates Muslim holidays [ECF No. 120 p. 36–38; ECF No. 116-83 pp. 14, 172–75; ECF No. 116-61 pp. 28–31]. Plaintiff also has demonstrated a sufficient understanding of the requirements of his Islamic faith, as he believes is commanded through the Quran and Hadith texts, including his belief that his faith requires that he grow, at minimum, a fist-length beard [*see, e.g.*, ECF No. 120 pp. 90–93; ECF No. 116-83 pp. 15–16; ECF No. 112-1]. Therefore, Plaintiff has demonstrated that he sincerely believes that, consistent with his religion, he must grow at minimum a fist-length beard.

ii. *<u>Whether the Challenged Policy "Substantially Burdens" that "Sincerely Held" Religious Belief</u>*

"Evidence sufficient to show a substantial burden falls on a spectrum," *Smith v. Comm'r, Ala. Dep't of Corr.*, 844 F. App'x 286, 290 (11th Cir. 2021) (citing *Thai Meditation Assoc. of Ala., Inc. v. City of Mobile*, 980 F.3d 821, 830–31 (11th Cir. 2020)), and requires a "case-by-case

analysis," *see Moussazadeh*, 703 F.3d at 791; *see also Adkins v. Kaspar*, 393 F.3d 559, 571 (5th Cir. 2004) (recognizing that RLUIPA "requires a case-by-case, fact-specific inquiry to determine whether the government action or regulation in question imposes a substantial burden on an adherent's religious exercise"). On one hand, a substantial burden places "more than an inconvenience on religious exercise." *Thai Meditation*, 980 F.3d at 829–30 (quoting *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004)). On the other hand, "a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct." *Midrash Sephardi*, 366 F.3d at 1227; *see also Holt*, 574 U.S. at 361 (holding that the plaintiff "easily" demonstrated that the Arkansas Department of Corrections' grooming policy substantially burdened the practice of his sincerely held religious beliefs when it forced the plaintiff to choose between "engag[ing] in conduct that seriously violates [his] religious beliefs"—i.e., shave his face—and "fac[ing] serious disciplinary action").

Plaintiff testified that, based on what he has perceived as a prisoner in FDOC facilities, his failure to comply with the FDOC Grooming Policy would lead to disciplinary action, placement in solitary confinement, and, potentially, being forcibly shaved by correctional officers [ECF No. 120 pp. 47–48, 54–55]. Plaintiff's statement, based on his personal knowledge of repercussions for failing to abide by FDOC policies, was credible, and Defendants failed to credibly rebut this statement on the record. As a result, the FDOC Grooming Policy forces Plaintiff to choose between either cutting his beard to a half inch in length, which "violates [his] religious beliefs," and "fac[ing] serious disciplinary action." *Holt*, 574 U.S. at 361. Therefore, the FDOC Grooming Policy substantially burdens Plaintiff's religious exercise.

*iii.* *Plaintiff has Satisfied his Initial Burden*

Having determined that Plaintiff has established sincerity of belief and substantial burden under RLUPA—i.e., that he sincerely believes, consistent with his Muslim faith, that he is compelled to grow, at minimum, a fist-length beard, and that the FDOC Grooming Policy substantially burdens his ability to abide by that sincerely held belief, *see* 42 U.S.C. § 2000cc-1(a)—the Court now examines whether Defendant has satisfied its burden to prove that the FDOC Grooming Policy both (1) serves a compelling government interest and (2) is the least restrictive means of furthering that stated interest. *See* 42 U.S.C. § 2000cc-1(a)(1)–(2).

**B. Defendant's Burden**

*i.* *Whether the Challenged Policy Serves a Compelling Government Interest*

First, Defendant must prove that the FDOC Grooming Policy serves one or more compelling governmental interests. 42 U.S.C. § 2000cc-1(a)(1). RLUIPA "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt*, 574 U.S. at 363 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726 (2014)). The question "is not whether [Defendant] has a compelling interest in enforcing" the FDOC Grooming Policy "'*generally*, but whether it has such an interest in denying an exception' from that requirement to [Plaintiff] *specifically*." *Mast v. Fillmore Cnty., Minn.*, 141 S. Ct. 2430, 2432 (U.S. 2021) (Gorsuch, J., concurring in the decision to grant, vacate, and remand) (quoting *Fulton v. Philadelphia*, 593 U.S. 522, 541 (2021)) (memorandum opinion) (emphasis in original).

Defendant's "compelling interest" argument can be boiled down into two distinct interests: (a) safety and security [ECF No. 120 pp. 30–31 ("Ultimately, the issue is prison safety and

security"); *see also* ECF No. ECF No. 116-26], and (b) minimizing cost [ECF No. 121 pp. 200–201 ("[T]he Department is not required to race to the top of the cost absorption ladder or the risk ladder"); *see also* ECF No. 123 p. 8 (arguing that granting Plaintiff an accommodation "would materially increase concealment, search, identification, and administrability [(cost)] concerns")]. The parties do not dispute that "[s]afety and cost are compelling governmental interests" [ECF No. 96 p. 4]. Indeed, the Eleventh Circuit has recognized that these are both compelling governmental interests. *See Lawson v. Singletary*, 85 F.3d 502, 512 (11th Cir. 1996) ("It is well established that states have a compelling interest in security and order within their prisons"); *Linehan v. Crosby*, 346 F. App'x 471, 473 (11th Cir. 2009) ("[T]he DOC has a compelling governmental interest in keeping costs down and preventing security risks"). Under the rationale of safety, the Supreme Court in *Holt* expressly recognized that the Arkansas Department of Corrections had "a compelling interest in staunching the flow of contraband into and within its facilities." *Holt*, 574 U.S. at 363. And under that same rationale, the Eleventh Circuit has recognized that prisons have a compelling interest in ensuring that prisoners are easily identifiable and unable to quickly and easily alter their appearance, *Knight v. Thompson*, 797 F.3d 934, 944–45 (11th Cir. 2015); *see also Harris v. Chapman*, 97 F.3d 499, 504 (11th Cir. 1996) ("This general interest in security clearly includes other specific interests . . . such as the identification of escapees and the prevention of the secreting of contraband or weapons in hair or beards").

Plaintiff's conviction and disciplinary histories demonstrate a documented propensity to deceive. Plaintiff was convicted of several robberies without a deadly weapon in which he used a BB-gun disguised as a firearm [ECF No. 120 pp. 129–31]. And even after Plaintiff's conversion to Islam in 2014, Plaintiff has received six disciplinary reports [ECF No. 120 pp. 49–50, 85–87; ECF No. 116-47]. All but one of these disciplinary reports was for contraband—four involved the

possession of cell phones in prison and one involved the possession of K2, a dangerous Schedule I drug [ECF No. 120 pp. 49–50, 85–87; ECF Nos. 116-47–116-52; 18 C.F.R. § 1308.11]. Plaintiff admits that possessing K2 was contrary to his religious beliefs [ECF No. 120 pp. 50, 86; *see also* ECF No. 116-52]. While this Court will not and does not engage in religious line-drawing, *see Thomas*, 450 U.S. at 715, it is notable that Plaintiff was willing to possess a highly dangerous substance—which, in small amounts, could be hidden in a fist-length beard—even when his faith commands him not to [*see, e.g.*, ECF No. 120 p. 183 (noting that Plaintiff could conceal "[v]arious types of [small] drugs" in his current one-inch beard "depending on the form in which they are wrapped")].

Plaintiff counters by arguing that (1) he has not received a disciplinary report for contraband in the last five years [ECF No. 121 p. 175], (2) his contraband involved primarily cell-phones, which cannot be hidden in a fist-length beard [ECF No. 121 p. 175], and (3) Inmate Shabazz had a far lengthier disciplinary history that Plaintiff and was still granted an exemption to the FDOC Grooming Policy [ECF No. 121 pp. 175–76]. Upon full review of these arguments, none is persuasive.

Plaintiff's disciplinary history includes five reports for possessing contraband while in prison, including K2—a highly dangerous Schedule I drug [ECF No. 120 pp. 49–50, 85–87, 217–18; ECF No. 121 pp. 34–35; ECF No. 116-52]. While Plaintiff argues that the contraband that he possessed—cellular devices and K2—could not be hidden in a fist-length beard [ECF No. 120 pp. 120–21; *see also* ECF No. 121 pp. 13–14, 175], this argument unsuccessfully attempts to minimize Plaintiff's uncontested history of possessing—and concealing—unauthorized items while in prison [*see, e.g.*, ECF No. 116-48 p. 1 (indicating that Plaintiff had concealed a unauthorized cell phone device in his shoe); ECF No. 116-52 p. 1 (indicating that Plaintiff had

attached a large quantity of K2 synthetic marijuana to his leg, which was observed sticking out of his "inner thigh")]. Further, while it is true that Plaintiff has not received a disciplinary report for possessing contraband since 2020, he nonetheless admitted, under oath, that he brought an electric trimmer—i.e., *contraband*—into an FDOC facility and used it for several years, including recently [ECF No. 120 pp. 100–104, 145–46; ECF No. 121 pp. 27–29; *see also* ECF No. 116-27] and that he attended trial in knowing violation of the FDOC Grooming Policy. *See supra* Finding of Fact 33. Finally, the disciplinary history at issue in *Shabazz* is irrelevant, as this Court is required to make an individualized inquiry into whether the FDOC Grooming Policy furthers a compelling government interest as applied to *Plaintiff*. *See, e.g.*, *Smith v. Owens*, 848 F.3d 975, 981 (11th Cir. 2017) ("Specifically, *Holt* calls for an individualized, context-specific inquiry that requires the GDOC to demonstrate that application of the grooming policy *to* [*the plaintiff*] furthers its compelling interests"). And given Plaintiff's history of possessing contraband as demonstrated on this record [ECF No. 120 pp. 49, 85–87; ECF Nos. 116-47–116-52], denying Plaintiff an exemption to the FDOC Grooming Policy furthers Defendant's compelling interest in preventing the flow of contraband.

*ii.* *Whether the Policy is the "Least Restrictive Means" in Furtherance of Defendant's Compelling Interest in Safety and Security*

Finally, Defendant must prove that the FDOC Grooming Policy is the least restrictive means of furthering its compelling interest in safety and security. *See* 42 U.S.C. § 2000cc-1(a)(2). "The least-restrictive-means standard is exceptionally demanding" and "requires the government to 'sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y].'" *Holt*, 574 U.S. at 364–65 (quoting *Hobby Lobby*, 573 U.S. at 728); *see also Hobby Lobby*, 573 U.S. at 728 (noting that a defendant must show "that it lacks other means of achieving its desired goal without imposing a substantial

burden on the exercise of religion by" the plaintiff). Therefore, "[i]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt*, 574 U.S. at 365 (quoting *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 815 (2000)).

To determine whether a policy is the least restrictive means, a court must inquire into "whether efficacious less restrictive measures actually exist . . . ." *Knight*, 797 F.3d at 946. In other words, Defendant must demonstrate that Plaintiff's "proposed alternatives . . . are ineffective." *Ali v. Stephens*, 822 F.3d 776, 786 (5th Cir. 2016) (citing *Yellowbear*, 741 F.3d at 63).

However, "[c]ontext matters" under RLUIPA, and courts must "apply the [RLUIPA's] standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security[,] and discipline, consistent with consideration of costs and limited resources.'" *Cutter*, 544 U.S. at 723 (quoting 146 Cong. Rec. 16698, 16699 (2000)). While "unquestioning deference" is not required or authorized, *see Smith v. Owens*, 13 F.4th 1319, 1329 (11th Cir. 2021), RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety," *Cutter*, 544 U.S. at 722; *see also Rodriguez v. Burnside*, 38 F.4th 1324, 1330 (11th Cir. 2022) (recognizing that an inmate's constitutional protections can be limited when they "conflict with an inmate's 'status as a prisoner or with the legitimate penological objectives of the corrections system'" (quoting *Pesci v. Budz*, 935 F.3d 1159, 1165 (11th Cir. 2019))). "And when critiquing a state penal system, principles of federalism 'bolster that deference.'" *Burnside*, 38 F.4th at 1330 (quoting *Pesci*, 935 F.3d at 1165).

Defendant has demonstrated that denying Plaintiff an exemption to the FDOC Grooming Policy is the least restrictive means in furtherance of its compelling interest to ensure safe and

secure prisons. *See* 42 U.S.C. § 2000cc-1(a). A prisoner's half-inch beard can be visually searched [ECF No. 120 pp. 183–84; *see generally* ECF No. 116-26]. However, a fist-length beard cannot be [ECF No. 121 p. 103]. As a result, either a corrections officer must physically search Plaintiff's beard—either in front of him or from behind him—or Plaintiff must be trusted to conduct a "self-search" of his own beard [ECF No. 120 p. 184]. But the record and the Factual Findings reached herein based on that record demonstrate that both of these alternatives creates unnecessary and intolerable risks to Defendant and correctional officers.

To begin, allowing Plaintiff to search his own beard by running his fingers through it presents an intolerable risk of non-compliance, as Plaintiff could manipulate his beard so that contraband could not be seen [ECF No. 120 pp. 207; ECF No. 121 pp. 15, 106, 122–23, 134; *see* Factual Finding 45. Given Plaintiff's history of concealing contraband while incarcerated [*see* ECF No. 116-47, ECF No. 116-48; ECF No. 116-52], Plaintiff could easily weave his beard to secure contraband contained therein or use a paste or other substance to ensure that, if his beard is manipulated, the contraband is secured in the beard and unable to be knocked loose [ECF No. 121 pp. 142–43; *see also* Factual Finding 46].

Further, requiring that correctional officers conduct a manual search of Plaintiff's beard presents separate challenges, as Defendant's witnesses credibly testified consistent with their decades of relevant expertise [*see, e.g.*, ECF No. 120 pp. 183–84; ECF No. 121 pp. 15, 102–03, 122–23; Factual Findings 4, 6, 46]. A search from behind Plaintiff would be highly ineffective; the searching officer could injure himself/herself if he/she is unable to see the hidden contraband; officers risk poking Plaintiff in the eyes or mouth; and the inmate could react to the intrusive search with violence [ECF No. 120 p. 204; ECF No. 121 pp. 122, 135]. Additionally, a search from in front of Plaintiff poses an intolerable risk of harm to the correctional officer conducting the search,

as searches from the front aggravate the risk of assault, especially when contraband is hidden within the beard [ECF No. 120 pp. 204–05; ECF No. 121 pp. 124, 138].

Plaintiff fails to present any evidence to undermine these conclusions or to weaken Defendant's showing. Plaintiff offers as an alternative the prospect of searching his beard himself or consenting to searches by correctional officers [*see* ECF No. 121 pp. 201–02], but those options are inadequate for all of the reasons stated above. And while Plaintiff maintains that he will not conceal contraband in his beard because it could fall out [*see* ECF No. 120 p. 64], Plaintiff's specific history of possessing—and concealing—contraband while incarcerated contradicts this claim, and in-turn increases the risk posed to a correctional officer searching Plaintiff's beard [ECF Nos. 116-47–116-52].

As a result, there exists no "efficacious" manner in which Defendant could, in light of Plaintiff's history of possessing contraband while in prison and criminal history, conduct safe searches of Plaintiff's beard. *See Knight*, 797 F.3d at 946–47. Defendants have thus met their burden of showing that no lesser restrictive alternatives "can adequately contain the risks associated with" allowing Plaintiff to grow a fist-length beard. *Id.* at 946; *see also* 42 U.S.C. § 2000cc-1(a)(2). Indeed, while Defendant has offered "logical and persuasive reasons to show that allowing" Plaintiff to grow a fist-length beard "would be unmanageable," *see Smith*, 13 F.4th at 1330, Plaintiff has "merely argued that [Defendant] should volunteer to assume" the risks associated with granting Plaintiff an exemption to the FDOC Grooming Policy. *Knight*, 797 F.3d at 946. RLUIPA places "no such duty" on Defendant, *id.*, and neither does this Court.

*iii.* *<u>Defendant has Satisfied its Burden under RLUIPA</u>*

Defendant has shown that the FDOC Grooming Policy, as applied to Plaintiff, both furthers its compelling interest in safety and security and is the least restrictive means in furtherance of that

compelling interest. Accordingly, Plaintiff is not entitled to an exemption from the FDOC Grooming Policy.[5]

## CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiff has stated a *prima facie* case under RLUIPA by proving that he sincerely believes that he must grow at least a fist-length beard, and that the FDOC Grooming Policy substantially burdens his exercise of that belief. *See* 42 U.S.C. § 2000cc-1(a).
2. Defendant has demonstrated that the FDOC Grooming Policy, as applied to Plaintiff, both furthers the compelling government interest of ensuring safe and secure prisons, and is the least restrictive means in furthering that interest. 42 U.S.C. § 2000cc-1(a)(1)–(2).
3. Final judgment will be entered by separate order pursuant to Rule 58 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 58.

**ORDERED** in Chambers at Fort Pierce, Florida, this 4th day of September 2026.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record

[5] Because Defendant has satisfied its burden as to "safety and security," the Court does not address Defendant's substantial interest in "mitigating costs."